**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **BRADLEY SHELTON,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No.: PWG-14-2031** |
| **UNITED STATES OF AMERICA, *et al.*,** | * | |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

While performing electrical work as a foreman for NCM Demolition & Remediation ("NCM") at the National Aeronautics and Space Administration ("NASA") Goddard Space Flight Center ("GSFC"), Plaintiff Bradley Shelton, came in contact with high voltage electricity in an electrical vault that should have been de-energized, but was not, and was severely injured. He filed this suit in negligence against the United States[1] and Capitol Technology Services, Inc. ("CTSI"), which was under a contract with NASA to provide facilities operations and maintenance services at NASA GSFC. CTSI filed a cross-claim against the United States for contribution and/or indemnification. ECF No. 22. Now pending is the Government's motion to dismiss the claims against it for lack of jurisdiction, or alternatively for summary judgment.

---

[1] Shelton's Complaint included two counts, Count I for negligence against the United States, with allegations against NASA and USACE, and Count II for negligence against CTSI. Shelton's claims against NASA and USACE were dismissed as "[t]he FTCA expressly provides that federal agencies are not amenable to suit under its provisions." Aug. 5, 2015 Mem. & Order 2–3 n.2, ECF No. 47.  Count I, therefore, is against the United States only.

ECF No. 69.[2]  At issue is whether an exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, bars the "sole claim" that Shelton "is continuing to pursue . . . against the Government," namely, that the Government "retained the duty to keep the people of GSF[C] safe from electrocution harm by means of coordinating the power disconnection, and that it breached its duty by informing NCM that the power was disconnected at Building 2 when it was not disconnected."  *See* Pl.'s Opp'n 10.  Because the misrepresentation exception to the FTCA bars this remaining claim against the Government, I will grant the motion to dismiss Shelton's claim against the Government and CTSI's cross-claim for contribution against the Government.  I also will dismiss CTSI's cross-claim for indemnification as premature.

## Background

To demolish an historic building ("Building 2") at NASA GSFC, the United States, through its agencies, NASA and the United States Army Corps of Engineers ("USACE"), awarded the Building 2 Task Order to NCM.  On August 1, 2011, the Government authorized NCM to proceed with the demolition of Building 2, but only for the asbestos "Abatement effort."  Partial Notice to Proceed, Jt. Ex. 16, Jt. Rec. 705, ECF No. 69-18.  "On August 12, 2011, NCM informed CTSI that it 'need[ed] to cut power'" so that NCM could 'demo walls that are on top of the floor tile.'"  Oct. 9, 2015 Mem. Op. 2–3, ECF No. 55 (quoting Jt. Rec. on CTSI's Mot. for Sum. J.).  Jeffrey Steir, who was a project manager at NASA at the time of the incident, informed Devin Miller, Project Engineer for NCM, on August 16, 2011 that "the power [was] turned off in the Building."  Steir Dep. 15:5–7, 122:12–123:4, Jt. Rec. 640, 667, Jt. Ex. 13, ECF

---

[2] The parties fully briefed the motion. ECF Nos. 69-1, 70, 71.  No hearing is necessary.  *See* Loc. R. 105.6.

No. 69-15.  Specifically, Steir testified that the following communication occurred on August 16, 2011 outside Building 2:

> O&M was there. I was there with Devin.  We were standing outside.  O&M was, a representative from O&M was inside the building and when they killed the switchgear, it took down the whole, I guess it was the west side first, and then they provided [sic] to the east side switchgears and then they turned them off and then all the power in the east side was turned off.  And *we said there you go, the power's turned off in the building*.

Steir Dep. 122:12–123:4, Jt. Rec. 667 (emphasis added).

The switchgear inside Building 2 "included an air break switch that could be used to turn off the power from Feeder 10," which fed power to Building 2.  Engineer's Preliminary Report 2, Ex. 1 to Pl.'s Opp'n to CTSI's Mot. for Sum. J., ECF No. 26-4.  "When the switch was turned off it de-energized the power to the load side," that is, the power running from the vault, inside Building 2.  *Id.*  Thus,

> on August 16, 2011, CTSI "secured the power in Building 2, . . . however, power was not cut at that time."  Instead, CTSI "perform[ed] a 'lockout tagout,' which consisted of locking and identifying switchgears and other components that were live or hot."  In other words, CTSI turned off the electricity within the building but kept it on in the electrical rooms, or "vaults," which were locked and on the doors of which were affixed warning signs.  "The warning sign on the outer back panel [of the switchgear cabinet] state[d] clearly that the panel should not be opened unless electrical power ha[d] been turned off."

Oct. 9, 2015 Mem. Op. 2–3 (quoting Jt. Rec. on CTSI's Mot. for Sum. J.).  Indeed, Steir testified that a "full blown-out killing of the power" was not done because "[i]t was never requested." Steir Dep. 113:6–11, Jt. Rec. 664.

Significantly, "[p]ower to the *line* side of th[e] switch," i.e., power running *to* the vault, "could only be turned off by disconnecting the power at a location outside of Building 2," that is, by "disconnecting Feeder 10 inside a manhole outside of Building 2."  Engineer's Preliminary Report 2 (emphasis added).  Shelton's August 29, 2011injury occurred in Building 2's electrical

vault, when Shelton came "in contact with or in proximity to the high voltage feeder 10 *line side*." NASA Report 15, Jt. Rec. 846 (emphasis added). NCM had removed the doors, and, in Shelton's "view, the locks and labels did not apply when a building was unoccupied, as was Building 2." Oct. 9, 2015 Mem. Op. 3. At that time, NCM had progressed to "removing copper solely for the purpose of salvage," even though its authorization to proceed only covered asbestos abatement. *Id.*

In his Complaint, Shelton alleged that the United States breached various "mandatory dut[ies]" to "follow safety procedures," to ensure the workers' safety, to provide adequate training, supervision, and oversight, "to test its circuits prior to demolition" and "to ensure that all electricity had been turned off." Compl. ¶¶ 21, 24–37, 39–58, 60–62, 64–65, ECF No. 1. Specifically, he claimed that "[t]he negligence occurred when in the time prior to the August 29, 2011 electrocution, NASA *failed to communicate* to USACE that the electrical lines had not been de-energized," instead "inform[ing] the on site project engineer that the electricity was off," and then USACE "*failed to communicate* to the demolition subcontractor, NCM, that the electrical rooms were off limits and that the switchgear was still live." *Id.* ¶¶ 22, 23 (emphasis added).

The Government moved to dismiss the negligence claim against it for lack of jurisdiction, on the basis that it was immune to suit under the independent contractor and/or discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671. ECF No. 23. I denied the motion, ruling that on the record before me at that time, "the evidence [was] disputed as to whose responsibility it was to de-energize the switchgear" and whether "the Government had a role in disconnecting the electricity," and therefore discovery was necessary to resolve the factual disputes, with the "disputed jurisdictional facts [being] very much intertwined with the

issue of liability." Aug. 5, 2015 Mem. & Order 6–8, ECF No. 47; *see also* Oct. 9, 2015 Mem. Op. 1 n.1, ECF No. 55 (noting that "a genuine dispute exist[ed] as to whether the Government or CTSI was responsible for workplace safety at the time of the accident").

Following the close of discovery, the Government renewed its motion to dismiss for lack of jurisdiction, alternatively moving for summary judgment.  In response, Shelton concedes that "the facts revealed through discovery do not support recovery against the government for [his] claims" that "the Government should have 1) detected the fact that the switchgear remained energized and warned NCM of potential hazards from energized equipment, 2) directed CTSI to secure the electrical vaults differently, 3) supervised NCM more closely, and 4) questioned CTSI's method, means, or timing of de-energizing Building 2," and therefore he "is no longer making any of those claims."  Pl.'s Opp'n 10.  Shelton asserts that the "sole claim" that he "is continuing to pursue . . . against the Government" is that the Government "retained the duty to keep the people of GSF[C] safe from electrocution harm by means of coordinating the power disconnection, and that it breached its duty by informing NCM that the power was disconnected at Building 2 when it was not disconnected."  *Id.*

Shelton cites NCM Project Manager Chance Jackson's deposition testimony, the USACE and NASA Reports, and statements by USACE representative Christopher Brooks as evidence that the Government erroneously stated that "the power to Building 2 had been air-gapped on August 16, 2011."  *See* Pl.'s Opp'n 9.  An "air gap is . . . where the line is cut, physically cut and there's no line going between the two." Steir Dep. 103:11–25, Jt. Rec. 662.  It is a means of "mak[ing] sure that the power has been completely cut to a building, "[a]nd a switch is not an air gap."  *Id.* As noted, NASA's Steir informed Miller of NCM on August 16, 2011 that "the power [was] turned off in the Building."  Steir Dep. 122:12–123:4, Jt. Rec. 667.  But, Steir testified that

he had not "witnessed prior to August 23rd, 2011 any air gapping in the project." *Id.* at 56:6–8, Jt. Rec. 650. Arguably, however, NCM could have understood Steir's statement to mean that the line side of the power in the vault was turned off, too.

Jackson testified that he "received . . . a work order *signed by the electrical subcontractor* specifically saying the feeder lines numbers. . . that were disconnected, air gapped" in a manhole outside of Building 2, although he could not recall when he received it. Jackson Dep. 45:23–46:23, 105:25–106:8, Jt. Rec. 271, 284, Jt. Ex. 4, ECF No. 69-6 (emphasis added). Jackson later testified that he "got that written work order from the owner," that is, the Government, explaining that CTSI "would give that to the owner, the owner would give it to [him], and then [he] knew that it was deenergized to perform work." *Id. Id.* at 46:2–4, 60:11–61:12, Jt. Rec. 271, 274–75. As for who in particular sent him the email, Jackson stated: "I would think that an e-mail with attachment would have came [sic] from Jeff Steir, that he would have got it from whatever department or subcontractor that he needed to." *Id.* at 106:9–14, Jt. Rec. 284. Jackson could not locate the work order. *See id.* at 106:15–18. He also stated that "it was [NCM] company policy . . . that [NCM] didn't want to just get a verbal nod or handshake or sentence that, oh, sure, this has been deenergized," and he "would not chance, a project manager would not allow my crew in there until I finally received that in an email from the Corps of Engineers." *Id.* at 56:8–22, Jt. Rec. 273.[3]

---

[3] None of the other evidence of record supports Shelton's position. Shelton asserts that Brooks "noted that 'the building was de-energized'" and that "'[p]ower feeders had been air gapped.'" Pl.'s Opp'n 2 (citing Aug. 23, 2011 Site Visit Notes 2, Jt. Rec. 825, Jt. Ex. 28, ECF No. 69-30). But, what Brooks reported was that "*Devin* stated that all power to the building was de-energized . . . ." Aug. 23, 2011 Site Visit Notes 2, Jt. Rec. 825 (emphasis added). "Devin" was "Devin Miller, Project Engineer for the Contractor, NCM." *Id.* Thus, this evidence shows that NCM, not the Government, made a statement that all power to the building had been cut. *See id.* As for the NASA Report, it states that, "[a]ccording to witnesses and email correspondence, the

### Standard of Review

"A court should grant a Rule 12(b)(1) motion 'if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *El-Amin v. Int'l Longshoremen's Ass'n Local No. 333*, No. CCB-10-3653, 2011 WL 2580630, at *2 (D. Md. June 28, 2011) (quoting *Evans v. B.F. Perkins, Co.*, 166 F.3d 642, 647 (4th Cir. 1999)). "A Rule 12(b)(1) motion to dismiss is not limited to challenges to jurisdiction appearing from the face of the complaint. In considering the allegations, the court may consider extrinsic evidence and, if such evidence is disputed, may weigh and determine the facts." *United States ex rel. Ackley v. Int'l Business Machines Corp.*, 76 F. Supp. 2d 654, 659 (D. Md. 1999) (citations omitted). The Court "regard[s] the pleadings' allegations as mere evidence on the issue," and may consider additional evidence. *Richmond, Fredericksburg & Potomac Ry. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Notably, if "'a defendant proffers evidence that calls the court's jurisdiction into question,'" then "no presumption of truthfulness attaches to the plaintiff's allegations." *Ackley*, 76 F. Supp. 2d at 659 (quoting *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998)).

When a defendant challenges subject matter jurisdiction, the burden is on the plaintiff to prove that subject matter jurisdiction exists. *See Evans*, 166 F.3d at 647; *El-Amin*, 2011 WL 2580630, at *2. To this end, limited discovery on the jurisdictional issue is, at times, appropriate

---

demolition subcontractor planned to have its electricians come to GSFC on August 23 to cut and 'air gap' power to Building 2." NASA Report 14, Jt. Rec. 845.  It does not state that the air-gap occurred earlier or that the Government represented that it had occurred earlier.  *See id.*  And, the USACE Report, as Shelton acknowledges, *see* Pl.'s Opp'n 4, states that the "indirect cause" of Shelton's injury was a "[m]is-communication from NASA O&M Department [CTSI] to the NASA Project Manager, Jeffrey Steir, and NCM Demolition and Remediation, LP."  USACE Report 2, Jt. Rec. 973.   Thus, the report states that the Government received a miscommunication, not that it was the original source of one.  *See id.*

before the court grants a Rule 12(b)(1) motion to dismiss. *See Watson v. CSA, Ltd.*, 376 F. Supp. 2d 588, 590 (D. Md. 2005) (noting that, "[i]n anticipation of Defendants' jurisdictional challenge, the Court allowed limited discovery on the question of [subject matter] jurisdiction"). In this case, "the jurisdictional facts are inextricably intertwined with the facts material to Plaintiff's negligence claim," and therefore I denied the Government's initial Rule 12(b)(1) motion, assumed jurisdiction, and allowed the case to proceed to discovery on its merits.  Aug. 5, 2015 Mem. & Order 1.  Now that the parties have completed discovery, I will consider the Government's renewed motion.

I note that Shelton argues that "[t]he Government's argument that they are entitled to judgment as a matter of law rests upon the Court resolving Mr. Jackson's credibility and weighing of the evidence, which is not appropriate at the summary judgment stage."  Pl.'s Opp'n 6.  Although the Court does not resolve factual disputes on a motion for summary judgment, *see* Fed. R. Civ. P. 56(a), on a Rule 12(b)(1) motion, as noted, "may weigh and determine the facts" when the evidence is disputed, *Ackley*, 76 F. Supp. 2d at 659.  Moreover, it is undisputed that NASA's Steir informed Miller of NCM on August 16, 2011 that "the power [was] turned off in the Building."  Steir Dep. 122:12–123:4, Jt. Rec. 667.  Thus, the Court could resolve the Rule 12(b)(1) motion based on this "material jurisdictional fact[] [that is] not in dispute." *El-Amin*, 2011 WL 2580630, at *2 (quoting *Evans*, 166 F.3d at 647).

## Discussion

Under the FTCA, the United States is liable, to the extent a private person would be, for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting under the scope of his office or employment."  28 U.S.C. § 1346(b)(1).  The FTCA, as a waiver of sovereign immunity, is to be

narrowly construed. *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992). And it exempts, *inter alia*, "claims arising out of . . . misrepresentation." *See* 28 U.S.C. § 2680(h).

Unlike when I considered the Government's first Rule 12(b)(1) motion—based on two different exceptions to the FTCA—and Shelton alleged that the Government had and breached a variety of duties, Shelton now asserts that he simply is claiming that the Government "retained the duty to keep the people of GSF[C] safe from electrocution harm *by means of coordinating* the power disconnection, and that it breached its duty *by informing* NCM that the power was disconnected at Building 2 when it was not disconnected." Pl.'s Opp'n 10 (emphasis added); *see id.* at 8–9 (stating that the Government "had the *duty to coordinate* the power disconnection for Building 2, and thus retained the duty to keep the people on the grounds of the Goddard Space Flight Center safe by coordinating the disconnection of the power in a responsible manner" (emphasis added)). The coordination role is integral to the Government's alleged duty, which does not extend beyond "coordinating the disconnection of the power to Building 2" and therefore is not a general duty to prevent electrocution. *See id.* at 7 ("The Government concedes that it's [sic] role (and thus liability) was *limited to coordinating* the disconnection of the power to Building 2." (emphasis added)). This duty is undisputed, as the Government concedes that it "retained a role in coordinating the disconnection of power for the project." Def.'s Mem. 21.

In his Complaint, Shelton claimed that the Government failed (1) "to communicate with all people working on its property," (2) "to make sure that CTSI and NCM clearly communicate with one another," and (3) "to make sure there is no confusion whether the power on its property has been shut off," and "[a]s a direct and proximate result of the aforesaid conduct and other tortuous acts and omissions of the defendant, the United States of America," Plaintiff was injured and "has suffered and continues to suffer from non-economic and economic losses." Compl.

¶¶ 38, 59, 63, 66.  Now, following discovery, Shelton contends that "[t]here is evidence in the record that the Government breached that duty by miscommunicating to Mr. Jackson that the power to Building 2 had been air-gapped on August 16, 2011, which in turn led to Mr. Jackson authorizing Mr. Shelton's team to demolish and salvage Switchgear 2 and ultimately Mr. Shelton being electrocuted."  Pl.'s Opp'n 9.

The Government argues that, "[w]here the plaintiff is essentially alleging he would not have been injured *but for* the communication of the misstatement, the misrepresentation exception applies."  Gov't Mem. 28.  On that basis, it contends that the misrepresentation exception to the FTCA "bars Shelton's allegations that the Government misrepresented the status of the switchgear" because, "[b]ut for the 'communication' allegedly provided by Steir to NCM . . . , and but for NCM's alleged reliance on Steir's representations, Shelton never would have been injured."  *Id.* at 26, 28.

Shelton insists that the Government "is not entitled to Judgment as a Matter of Law based on the misrepresentation exception to the Federal Tort Claims Act, because the misrepresentation exception only encompasses claims that state the Government had a duty not to misrepresent facts to a private party."  Pl.'s Opp'n 6.  According to Plaintiff, "the negligent misrepresentation tort is not claimed"; rather, he "claims that the Government had a duty to keep everyone at GSFC safe from being electrocuted by coordinat[ing] between multiple parties, and breached that duty by failing to properly coordinate."  *Id.*

It is true that Shelton's claim against the Government sounds in negligence, not negligent misrepresentation.  *See* Compl. 4.  In this regard, *Block v. Neal*, 460 U.S. 289 (1983), and *United States v. Neustadt*, 366 U.S. 696 (1961), are informative.  In *Block*, to finance the construction of a prefabricated house, Onilea Neal obtained a Farmers Home Administration ("FmHA") loan

and technical assistance from the United States Secretary of Agriculture. 460 U.S. at 290–91.

During the construction, FmHA provided advice and inspected the property and ultimately

"issued a final report . . . which indicated that the construction accorded with the drawings and

specifications" that it had approved. *Id.* at 291–92. After Neal moved into the home, multiple

construction defects were identified, "includ[ing] deviations from plans approved by FmHA."

*Id.* at 292. After the trial court dismissed Neal's complaint against the Government, the appellate

court reversed, finding that Neal stated a claim in negligence and that her "negligence claim did

not fall within this [misrepresentation] exception to the waiver of sovereign immunity." *Id.* at

293-94. The Supreme Court affirmed, differentiating the case from *Neustadt*. *Id.* at 294.

In *Neustadt*, the *Block* Court observed, Stanley Neustadt "purchased a house in reliance

on an appraisal undertaken by the Federal Housing Administration (FHA) for mortgage

insurance purposes," and after moving in, learned that there were "structural defects that had not

been noticed by the FHA appraiser during the course of his inspection." 460 U.S. at 295. He

"sued the Government under the Tort Claims Act . . . alleg[ing] that the FHA had negligently

inspected and appraised the property, and that he had justifiably relied on the appraisal in paying

a higher price for the house than he would have otherwise paid." *Id.* The Supreme Court held

that Neustadt's claim "arose out of 'misrepresentation' under § 2680(h)," because "the essence

of an action for misrepresentation, whether negligent or intentional, is the communication of

misinformation on which the recipient relies," and "[t]he gravamen of the action against the

Government in *Neustadt* was that the plaintiff was misled by a 'Statement of FHA Appraisal'

prepared by the Government." *Id.* at 296. The *Block* court observed that "Neustadt alleged no

injury that he would have suffered independently of his reliance on the erroneous appraisal." *Id.*

It explained: "Because the alleged conduct that was the basis of his negligence claim was in

essence a negligent misrepresentation, Neustadt's action was barred under the 'misrepresentation' exception." *Id.* at 296–97.

In contrast, in *Block*, the Supreme Court concluded that the exception did not apply, reasoning that "the Government's misstatements [were] not essential to plaintiff's negligence claim." *Id.* at 297.   The Court noted that the duty underlying Neal's negligence claims was a duty for the FmHA officials "to use due care in carrying out their supervisory activity," that is, a "duty to use due care to ensure that the builder adhere to previously approved plans and cure all defects before completing construction," which "is distinct from any duty to use due care in communicating information to respondent." *Id.*  Further, it did "not 'appea[r] beyond doubt' that the only damages alleged in the complaint to be caused by FmHA's conduct were those attributable to Neal's reliance on FmHA inspection reports." *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)).   Thus, the misrepresentation exception "does not bar negligence actions which focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty." *Id.*

Here, as noted, the duty is one of coordination.  *See*  Pl.'s Opp'n 10; Def.'s Mem. 21.  To coordinate with NCM and CTSI to ensure the disconnection of power, the Government necessarily had to communicate.   Indeed, the alleged breach is a failure to communicate accurately.  *See* Compl. ¶¶ 38, 59, 63.  According to Shelton, "[t]here is evidence in the record, based on Mr. Jackson's testimony, the OSHA Report, and the US Army Corps of Engineers Report, [that] demonstrates that the government informed NCM that the power to Building 2 had been cut through an air-gap on August 16, 2011," when, in fact, that was not the case. Pl.'s Opp'n 10.  Thus, the focus of Shelton's negligence action is not "on the Government's breach of a different duty"; it is "on the Government's failure to use due care in communicating

information." *See Block*, 460 U.S. at 297.   Therefore, this case is not like *Block* where the alleged duty was "distinct from any duty to use due care in communicating information." *See id.* at 297.

Moreover, as in *Neustadt*, Shelton "alleged no injury that he would have suffered independently of his reliance on the erroneous [statement that the Government allegedly made]." *Block*, 460 U.S. at 296.  Rather, Plaintiff claims that he relied on the Government's statement to proceed with his work, which brought him in contact with electricity. *See* Pl.'s Opp'n 1, 9.  He claims that he would not have come in contact with it but for the Government's alleged misrepresentation. *See id.*  Thus, unlike in *Block*, "the only damages alleged in the complaint to be caused by [the Government's] conduct [are] those attributable to [NCM's, and consequently Shelton's] reliance on [the Government's alleged communication]." *See Block*, 460 U.S. at 297.  And, unlike in *Block*, the Government's statement was "essential to plaintiff's negligence claim." *See id.* at 297.    In sum, the "essence" of Shelton's claim is that it is the Government's communication that the power was shut off when it was still live on the line side in the vault, and Shelton's reliance on that communication, which caused his injury.  Therefore his claim arises "out of 'misrepresentation under § 2680(h)" and is barred under the misrepresentation exception to the FTCA. [4] *See id.* at 296.  This Court lacks jurisdiction over the claim against the Government under the FTCA. *See id.*; 28 U.S.C. § 2680(h).

---

[4] Because I find that the misrepresentation exception bars Shelton's claim against the Government, I need not consider the Government's arguments that the independent contractor exception and the discretional function exception also bar the claim.

## CTSI's Cross-Claims

In the Government's view, "[b]ased upon the same record facts, CTSI's cross-claims against the United States for indemnity or contribution are similarly precluded." Def.'s Mem. 5. CTSI did not file an opposition. With regard to contribution, the Government accurately states, *id.* at 29:

> Under applicable Maryland law, there can be no contribution claim if the plaintiff has no right of action against the party from whom contribution is sought. *Pyramid Condo. Ass'n v. Morgan*, 606 F. Supp. 592, 598 (D. Md. 1985); *Montgomery Cnty. v. Valk Mfg. Co.*, 562 A.2d 1246, 1253 (Md. 1989). "Therefore, when the alleged tortfeasor enjoys immunity from the plaintiff's claim, no claim to contribution exists because there is no common liability." *Kelly v. Fullwood Foods, Inc.*, 111 F. Supp. 2d 712, 715 (D. Md. 2000) (citing and quoting *Valk Mfg.*, *supra*) (internal quotation marks omitted).

Because the misrepresentation exception bars Shelton's claim against the Government, CTSI cannot state a cross-claim for contribution. *See Kelly*, 111 F. Supp. 2d at 715. Therefore, CTSI's cross-claim for contribution is dismissed. *See id.*; *Pyramid Condo. Ass'n*, 606 F. Supp. at 598; *Montgomery Cnty.*, 562 A.2d at 1253.

As for indemnification, under Maryland law, "a claim for indemnification is derivative, and does not arise, unless and until the party seeking indemnification has paid an adverse judgment or settlement." *Chesapeake Bay Found., Inc. v. Weyerhaeuser Co.*, No. PWG-11-47, 2015 WL 2085477, at *11–12 (D. Md. May 4, 2015) (quoting *Cofield v. Lead Indus. Ass'n*, No. MJG-99-3277, 2000 WL 34292681, at *8 (D. Md. Aug. 17, 2000) (citing *Read Drug v. Colwill Constr.*, 243 A.2d 548, 558 (Md. 1968))); *see S. Md. Oil Co. v. Texas Co.*, 203 F. Supp. 449, 452–53 (D. Md. 1962) ("[T]he rights both to indemnification and to contribution, whether based on contract or tort, accrue at the time of payment and not before."). There has not yet been a judgment against CTSI, and there may not be one. Thus, the indemnification claim had not accrued. *See Chesapeake Bay Found.*, 2015 WL 2085477, at *11–12; *Cofield*, 2000 WL

34292681, at *8; *S. Md. Oil Co.,* 203 F. Supp. at 452–53.   Therefore, I will dismiss the indemnification claim without prejudice to renewal at such time that CTSI has made a payment pursuant to a judgment or settlement.  *See Chesapeake Bay Found.*, 2015 WL 2085477, at *11– 12; *Cofield*, 2000 WL 34292681, at *8; *S. Md. Oil Co.,* 203 F. Supp. at 452–53.

## **Remaining Claim against CTSI**

Shelton filed suit in this Court pursuant to the FTCA, asserting that the Court had supplemental jurisdiction over the state law claim for negligence against CTSI (Count II). Compl. ¶¶ 1–2.  Now that the claims against the United States have been dismissed, I must consider whether the retain the state law claim against CTSI.

> Pursuant to 28 U.S.C. § 1367(c), the court has discretion to retain or dismiss nonfederal claims where, as here, the federal basis of the action is no longer applicable. District courts in the Fourth Circuit "enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). In deciding whether to exercise discretion, courts consider factors such as the "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id.* (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Ultimately, supplemental jurisdiction "is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Id.* (quoting *Carnegie– Mellon Univ.*, 484 U.S. at 350).

*Snead v. Bd. of Educ. of Prince George's Cnty.*, 815 F. Supp. 2d 889, 897 (D. Md. 2011).  Given that this case has proceeded in this Court for more than two and a half years, during which time I have ruled on motions to dismiss and for summary judgment and the parties have completed discovery, and I may yet be called upon to resolve CTSI's indemnification claim against the Government, I will exercise my discretion to retain the remaining claim.  *See id.*  I note that this claim also could have been brought in this Court under this Court's diversity jurisdiction, as the parties are diverse and Plaintiff seeks well over $75,000.  *See* 28 U.S.C. § 1332(a)(1).

## **ORDER**

Accordingly, for the reasons stated above, it is, this 21st day of February, 2017, hereby ORDERED that the Government's Motion to Dismiss, or in the Alternative, for Summary Judgment, ECF No. 69, IS GRANTED as follows:

a. Shelton's negligence claim against the Government (Count I) and CTSI's cross-claim for contribution against the Government, ECF No. 22, ARE DISMISSED for lack of subject matter jurisdiction; and

b. CTSI's cross-claim for indemnification against the Government, ECF No. 22, IS DISMISSED as premature.

Shelton's remaining claim against CTSI (Count II) will proceed to trial, and I will schedule a call to set a trial date.


_____/S/_____
Paul W. Grimm
United States District Judge